**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : : : |
| Plaintiff, | : CASE NO. 5:10-cv-01235 : |
| v. | : Judge Kathleen M. O'Malley : |
| GREGORY GESWEIN, KEVIN KRAKORA, and SANDRA MILLER, | : JURY TRIAL : : : |
| Defendants. | : : |

## FIRST AMENDED COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission") alleges the following as its First Amended Complaint:

## SUMMARY

1.      This action involves earnings management fraud by the financial management of Diebold, Incorporated ("Diebold"), an Ohio corporation that manufactures and sells automated teller machines ("ATMs"), bank security systems, and electronic voting machines.  Gregory Geswein, Diebold's former Chief Financial Officer ("CFO"), Kevin Krakora, Diebold's former Controller and later its CFO, and Sandra Miller, Diebold's former Director of Corporate Accounting, engaged in fraudulent accounting practices to inflate earnings to meet forecasts. From at least 2002 to 2007, these fraudulent practices included (i) improper use of "bill-and-hold" accounting; (ii) improper recognition of revenue on a lease agreement subject to an

undisclosed side buy-back agreement; (iii) manipulating reserves and accruals; (iv) improperly delaying and capitalizing expenses; and (v) improperly writing up the value of used inventory.

2.     As a result of these practices, Diebold filed at least 40 annual, quarterly, and current reports with the Commission, issued dozens of press releases, and otherwise made public statements that contained material misstatements and omissions concerning the company's financial performance.  Diebold's improper, and in many instances fraudulent, accounting practices misstated the company's reported pre-tax earnings by at least $127 million.  To correct the most recent misstatements, on September 30, 2008, Diebold restated its financial statements for the years 2003 through 2006, and the first quarter of 2007, in its Form 10-K for 2007.

3.     By engaging in the practices and transactions alleged in this Complaint, Geswein, Krakora, and Miller violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)], Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Exchange Act Rules 10b-5 and 13b2-1 [17 C.F.R. §§ 240.10b-5 and 240.13b2-1] and aided and abetted Diebold's violations of Exchange Act Sections 13(a), 13(b)(2)(A) and13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].  Geswein and Krakora also violated Exchange Act Rules 13a-14 and 13b2-2 [17 C.F.R. §§ 240.13a-14 and 240.13b2-2], and Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243].

4.     The Commission seeks entry of a final judgment permanently enjoining each defendant from further violations of these federal securities laws, ordering disgorgement of ill-gotten gains with prejudgment interest, imposing civil monetary penalties, and, with respect to

Geswein and Krakora, ordering that they reimburse Diebold for bonuses and other incentive and equity compensation that they received, and that the Court impose an officer-and-director bar.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to Securities Act Sections 20 and 22(a) [15 U.S.C. §§ 77(t) and 77v(a)] and Exchange Act Sections 21 and 27 [15 U.S.C. §§ 78u and 78aa].  Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce or the mails, or a facility of a national securities exchange, in connection with the conduct alleged herein.

6.      Venue is proper because certain of the acts, practices, and courses of business constituting the violations occurred within this judicial district.

## DEFENDANTS

7.      **Gregory Geswein**, 55, is a resident of Toledo, Ohio.  He was the CFO of Diebold from 2000 to 2005.  He was Diebold's principal accounting officer from 2000 to 2002 and principal financial officer from 2000 to 2005.

8.      **Kevin Krakora**, 54, is a resident of Canton, Ohio.  He was Diebold's Controller from 2001 through 2005, and the company's CFO from 2005 through April 2009.  Krakora was Diebold's principal accounting officer from 2003 to 2006 and principal financial officer from 2005 to 2009.  When Krakora was Diebold's Controller, he reported directly to Geswein. Krakora stepped down as Diebold's CFO in April 2009, but remains an employee of Diebold. Krakora was a certified public accountant licensed in Ohio, but his license is now inactive.

9.      **Sandra Miller**, 42, is a resident of Paris, Ohio.  She was Diebold's Director of Corporate Accounting from 2002 to 2006.  During her tenure at Diebold, Miller reported to Krakora.  Miller is a certified public accountant licensed in Ohio.

## RELEVANT ENTITY

10.    **Diebold** is an Ohio corporation headquartered in North Canton, Ohio.  Diebold

manufactures and sells ATMs, bank security systems, and electronic voting machines.  Diebold's

common stock is registered with the Commission pursuant to Exchange Act Section 12(b) and is

listed on the New York Stock Exchange.

## FACTS

11.    From 2002 to 2007, Diebold management conducted meetings known as monthly

business reviews ("MBRs"), in which each Diebold business unit would review the past month's

financial performance and that quarter's projected results.  Geswein, and later Krakora, would

then compare the company's projections to stock analysts' consensus earnings projections for

Diebold.  Typically, Diebold's internally projected earnings were lower than the analyst

consensus earnings projection.  Toward the end of most quarters, Krakora compiled "opportunity

lists" of ways to close the gap between the company's actual financial results and analyst

forecasts.  Krakora reviewed such lists with Geswein. While some items on the "opportunity

lists" represented legitimate business opportunities, others were fraudulent accounting

transactions designed to improperly recognize revenue or otherwise inflate Diebold's financial

performance.

12.    As quarters came to a close, Geswein and Krakora received "flash reports,"

sometimes on a daily basis, comparing Diebold's actual earnings to analyst consensus earnings

forecasts, which were often referred to as "required" or "necessary" earnings.  Geswein and

Krakora used the often improper "opportunities" from the "opportunity lists" that they devised to

reach this earnings target.  Miller made various manual accounting entries corresponding to these

"opportunities" to Diebold's books.  Miller knew, or was reckless in not knowing, that these

"opportunities" and the corresponding manual journal entries were improper.  The Defendants

knew or were reckless in not knowing that their actions were causing Diebold to report materially false financial results to the public.

13.     As described below, Geswein, Krakora, and Miller, acting knowingly or recklessly, each orchestrated and/or participated in one or more of the following fraudulent accounting practices, which caused Diebold to report materially false and misleading financial results to the public: (i) improper use of "bill-and-hold" accounting; (ii) improper recognition of revenue on a lease agreement subject to an undisclosed side buy-back agreement; (iii) manipulating reserves and accruals; (iv) improperly delaying and capitalizing expenses; and/or (v) improperly writing up the value of used inventory.  As a result of these fraudulent accounting schemes, Geswein and Krakora made numerous material false and misleading statements and omissions of material fact in press releases, to investment analysts on conference calls, and in Diebold's Forms 8-K, 10-Q, and 10-K filed with the Commission.

**Improper Use of "Bill-and-Hold" Accounting to Prematurely Recognize Revenue**

*Background on Diebold's Use of "Bill-and-Hold" Accounting*

14.     Under Generally Accepted Accounting Principles ("GAAP"), a seller of goods generally may not recognize revenue until, among other things, the product is delivered to the customer.  An exception exists, however, for what is known as "bill-and-hold" transactions.  If a transaction meets the criteria for "bill-and-hold" treatment, the seller may be permitted to recognize the revenue under GAAP before delivery of the product to the customer.

15.     For a transaction to qualify as "bill-and-hold" (thus allowing revenue recognition under GAAP before delivery to the customer), the following criteria must be satisfied:  (i) the buyer, not the seller, requests that the transaction be on a bill-and-hold basis, (ii) the buyer has a substantial business purpose for ordering on a bill-and-hold basis, (iii) there is a fixed delivery

schedule that is reasonable and consistent with the buyer's business purpose, (iv) the seller does not retain any specific performance obligations such that the earnings process is incomplete, and (v) the products are ready for shipment.

16.     From at least 2002 through 2007, Diebold designated numerous of its sales contracts as "F-term" orders, or "Factory" orders.  Diebold recognized revenue on F-term orders when the products were shipped from Diebold's factory to a Diebold warehouse, rather than when the products were delivered and installed at the customer's location.  Thus, Diebold recognized revenue under all of its F-term orders on a bill-and-hold basis.

17.     To satisfy the delivery requirement under GAAP, as described above, recognition of revenue when the products were shipped from Diebold's factory to its warehouse – such as in Diebold's F-term orders – would only be proper if those transactions met the criteria for bill-and-hold transactions.

*Diebold Improperly Used Bill-and-hold Accounting*

18.     As detailed below, during at least the period of 2002 through early 2007, Diebold routinely recognized revenue on products before the company delivered the products to the customer (i.e., under F-term orders), even though many of those transactions did not meet the bill-and-hold criteria for doing so.  As a result, Diebold prematurely recognized material amounts of revenue and earnings.  This caused Diebold's reported financial results to be materially false and misleading.

19.     Geswein, Krakora, and Miller knew or were reckless in not knowing that Diebold systematically recognized revenue on F-term orders prematurely, in violation of GAAP, and that, therefore, Diebold's reports filed with the Commission, as well as Diebold's press releases and other statements to the public, made false and misleading statements and omissions of material fact about Diebold's financial performance.

20.     Geswein and Krakora knew or were reckless in not knowing that F-term orders did not meet the bill-and-hold criteria, but did not want to eliminate this improper accounting because it would reduce Diebold's reported revenue in the short-term, and also force the disclosure of Diebold's widespread bill-and-hold practices.

21.     After the Commission's Staff Accounting Bulletin 104 was published in December 2003 (which, among other things, reiterated the criteria for bill-and-hold accounting), Defendants became concerned that Diebold's revenue recognition practices would not withstand scrutiny.

22.     Beginning in 2004, Defendants carried out plans to create and rely on form documents that purported to show that many of Diebold's sales supposedly met the criteria for bill-and-hold revenue recognition under GAAP, even though the Defendants knew or were reckless in not knowing that the documents were untrue in many transactions, and those transactions did not legitimately qualify for bill-and-hold treatment.

23.     For example, in early 2004, Krakora, with Miller's assistance, redrafted the company's form sales contract, known as a Memorandum of Agreement ("MOA") in an effort to make it appear that Diebold customers using the MOA were requesting a product on a bill-and-hold basis for the customer's business purposes even if the customers had not actually requested this and/or did not have a business purpose for bill-and-hold.

24.     Geswein, Krakora, and Miller knew, or were reckless in not knowing, that notwithstanding the revisions to the MOA, the transactions did not meet the criteria for bill-and-hold treatment to recognize revenue under GAAP because, for example, customers were not generally requesting products on a bill-and-hold basis, and bill-and-hold treatment was not being used for the customers' own business purposes.   Thus, Geswein, Krakora and Miller knew or

were reckless in not knowing that Diebold could not properly recognize revenue before delivery of the products to the customer.

*Improperly Converting Contracts to Bill-and-Hold Status*

25.    In 2004, Krakora and Miller also drafted a standard form contract to convert "I-term" orders – orders for which Diebold recognized revenue upon installation at the customer site – to purported bill-and-hold transactions.  With regard to customers who agreed to sign this form at Diebold's request, rather than at the customer's request and for the customer's business purposes, Diebold improperly recognized revenue on the transaction when the product was shipped from Diebold's factory to its warehouse.

26.    As discussed previously, the accounting criteria for bill-and-hold transactions require that, in order for Diebold to recognize revenue before delivery to the customer, the customer – not Diebold – must request that the transaction be on a bill-and-hold basis, and the buyer must have a substantial business purpose for ordering on a bill-and-hold basis.

27.    Contrary to the above requirements for bill-and-hold accounting, Geswein, Krakora, and other Diebold management encouraged its sales force to request that customers execute the forms to convert "I-term" orders to bill-and-hold transactions.  Geswein and Krakora often did this on "make the quarter" calls, notwithstanding concerns raised by sales personnel.  For example, in June 2005, a Diebold sales manager wrote an email that was forwarded to Krakora stating that the sales staff was "trying to help Diebold's revenue recognition drive," but raised concerns about asking customers to sign bill-and-hold forms in instances when Diebold was at fault for installation delays.  Krakora took no action at the time to correct this improper practice.  Another employee responded to the sales manager's original email stating:  "This is like the crazy aunt in the cellar no one wants to talk about."

28.     As an example of the improper efforts to create the false appearance that customers had requested bill-and-hold transactions in the fourth quarter of 2004, a Diebold sales representative had a customer, Charter One Bank ("Charter One"), sign a bill-and-hold form to convert a $4 million I-term order into a purported bill-and-hold transaction.  The sales representative was carrying out instructions from his superiors to get a bill-and-hold form from Charter One, rather than responding to a request from Charter One for bill-and-hold treatment.

29.     In late 2004, Diebold personnel informed Geswein that Charter One would sign a bill-and-hold form but that Charter One was unwilling to actually pay for the equipment until it was installed.

30.     Geswein nevertheless instructed his subordinates to have Charter One sign the bill-and-hold form, even though he knew that Charter One had not requested bill-and-hold and would not pay until installation.

31.     The Charter One transaction did not meet the criteria for bill-and-hold treatment and recognition of the revenue from the sale in the fourth quarter of 2004.

32.     In a later conference call among Geswein and other Diebold personnel in early 2005, Geswein was again told that Charter One had signed the bill-and-hold form (which by its terms required payment upon receipt of the invoice sent when Diebold shipped the products to its own warehouse), but that Charter One would not pay for the ATMs before they were installed. Geswein's response was that the company should take the revenue, and "we'll worry about the receivables later."  Geswein thus caused Diebold to improperly recognize revenue on the transaction in the fourth quarter of 2004.

33.     Geswein knew or was reckless in not knowing that Diebold could not properly recognize the revenue from the Charter One transaction in the fourth quarter of 2004.  Even

though Charter One was invoiced in the fourth quarter of 2004, it did not pay for this transaction until the second quarter of 2005 (after Diebold delivered and installed the products).  This transaction inflated Diebold's earnings in the fourth quarter of 2004 by about $2 million.

34.     By prematurely including the revenue from the Charter One transaction, Diebold was able to report that it met the low end of its projected earnings for the fourth quarter of 2004. Without the revenue from the Charter One transaction in that quarter, Diebold would have missed its projected earnings.

35.     Geswein announced Diebold's revenues and earnings for the fourth quarter of 2004 in a conference call with analysts on January 26, 2005.  On or about March 4, 2005, Geswein signed Diebold's Form 10-K for 2004, which also reported Diebold revenues and earnings for the fourth quarter of 2004.  Geswein knew or was reckless in not knowing that financial figures Diebold announced and reported were materially false and misleading because, among other things, they included prematurely recognized revenue from the transaction described above.

*Improperly Recognizing Revenue Regarding Incomplete Products*

36.     By at least 2005, Krakora and Miller knew or were reckless in not knowing that many of Diebold's supposed bill-and-hold sales of ATMs failed to meet another of the bill-and-hold criteria:  That the products must be complete and that the seller must not retain any specific performance obligations.  In fact, many of the ATMs sold under purported bill-and-hold terms were not complete because key software had not been loaded by the time that Diebold recognized revenue from the sales.  Krakora and Miller knew, or were reckless in not knowing, that Diebold was prematurely recognizing revenue on such incomplete products.

*Improperly Recognizing Revenue For Professional Services and Upgrades*

37.     Additionally, by at least 2005, Krakora and Miller knew or were reckless in not knowing that Diebold was recognizing revenue for professional services and upgrades on a bill-and-hold basis.   Krakora and Miller knew, or were reckless in not knowing, that revenue cannot be recognized on services and upgrades on a bill-and-hold basis.

*"Pulling in" F-Term orders*

38.     At certain times during the period 2004 through 2006, in connection with Diebold's efforts to meet its earnings forecasts, Geswein and Krakora resorted to recognizing revenue even earlier on some F-term orders by directing the manufacturing and shipment of products to the warehouse before the shipment dates contained in the MOAs.  Diebold would then record revenue on the products it shipped to its warehouse early.  This practice was known as "pulling in" F-terms.

39.     The amount of F-term orders "pulled in" varied by quarter, but in many instances was done purposely to inflate earnings in order to meet forecasts.  In these instances, Geswein and Krakora instructed Diebold's manufacturing personnel to manufacture products early, without customer notice or approval, for the purpose of recognizing revenue in an earlier reporting period.  For example, in June 2004 (the last month of the second quarter), Diebold "pulled in" about $3.4 million of F-term orders that were scheduled to be shipped to the warehouse in July 2004, and in December 2004 (the last month of the fourth quarter), Diebold "pulled in" about $3.8 million of F-term orders that were scheduled to ship to the warehouse in January 2005.   These "pull ins" inflated Diebold's earnings in these quarters by about $1.1 million and about $1.3 million, respectively.

40.     Geswein and Krakora knew, or were reckless in not knowing, that "pulling in" F-term orders was not in accordance with GAAP, and that Diebold was prematurely recognizing revenue on these transactions and, therefore, falsely reporting its revenues and earnings.

*The $7.5 Million Revenue Recognition Reserve*

41.     In January 2004, as part of its 2003 year-end audit, Diebold's auditor tested a sample of Diebold's 2003 bill-and-hold transactions.  This testing found that Diebold had prematurely recognized revenue on certain transactions, and that in certain instances Diebold had recognized revenue on transactions inconsistent with company policy.  In response, Diebold established a reserve representing $7.5 million of profit margin in the last quarter of 2003.  This reserve was derived by extrapolating the errors found in the auditor's sample.

42.     In February 2004, Krakora and Miller learned that Diebold had prematurely recognized revenue in the fourth quarter of 2003, on a $5.2 million order from PNC Bank.  This had not been identified as an error by the company's auditor during its testing.  Notwithstanding, Krakora and Miller did not correct this error or adjust the $7.5 million profit margin reserve that the company had established to account for errors the auditor had found during its audit, even though this error demonstrated that the reserve was inadequate.

43.     Krakora and Miller knew or were reckless in not knowing that GAAP required Diebold to correct the applicable 2003 financial statements to reflect the effect of this known error of $5.2 million.  Yet, Krakora and Miller failed to do so.

*Improper "Smoothing" of Earnings Impact*

44.     In 2004, when Defendants began using the revised MOA, Geswein and Krakora knew that this would result in fewer F-term orders and less revenue in 2004, as it was envisioned that many customers would not agree to the new terms.

45.     To improperly "smooth" the negative impact to earnings from these changes, Geswein and Krakora decided to stagger the implementation of the new practices.  Starting in April 2004, Diebold started applying the new practices to orders from its larger national bank customers.  Diebold decided to wait until July 2004 to apply the practices to orders from its smaller regional bank customers.

46.     However, certain Diebold personnel began applying the new revenue recognition practices to some regional bank orders earlier than Geswein and Krakora had planned, resulting in fewer orders being designated as F-term, and thus less revenue being recognized early. Geswein and Krakora discovered this and realized that the company would not meet its earnings forecast for the third quarter of 2004.  In or about August and September 2004, Geswein and Krakora instructed Diebold financial personnel to make a significant "top line" journal entry that would prematurely and artificially pull revenue into the third quarter of 2004 with regard to sales that, based upon the new bill-and-hold procedures, actually would not generate revenue until later.  In accordance with Geswein's and Krakora's direction, Diebold financial personnel made an $18.8 million top line journal entry that prematurely recognized revenue that otherwise would not and should not have been recognized until later quarters.

47.     As a result of this improper $18.8 top line entry, Diebold met its revised earnings forecast in the third quarter of 2004.  Geswein and Krakora knew, or were reckless in not knowing, that the making of such a top line entry had no accounting basis, violated GAAP, and was solely used to "smooth" or mitigate the impact of Diebold's 2004 revenue recognition changes.

*False and Misleading Statements and Omissions of*
*Material Fact Involving Bill-and-Hold Accounting*

48.     Diebold's premature recognition of revenue on certain F-term orders, based upon

the many improper actions of Defendants Geswein, Krakora and Miller, described above,

resulted in revenue and earnings misstatements in each of Diebold's quarterly and annual

financial statements from 2003 through the first quarter of 2007.  In 2003 alone, Diebold

overstated its earnings before taxes by $29.5 million (or over 11%) due to premature recognition

of revenue on supposed bill-and-hold transactions.

49.     In 2008, Diebold restated its financial statements for the reporting periods from

2003 through the first quarter of 2007, and announced that going forward it would recognize

revenue upon customer acceptance of goods or services, and not on an F-term basis.  In its

restatement, Diebold retroactively applied this new revenue recognition policy which alone

resulted in a decrease of the company's total earnings before taxes of $56.2 million.

50.     As a result of the misuse of bill-and-hold accounting and the resulting premature

recognition of revenue, as described above, Geswein and Krakora signed and caused Diebold to

file materially false and misleading Forms 10-K, 10-Q, and 8-K with the Commission during the

periods from 2003 through the first quarter of 2007, and made materially false and misleading

statements and omissions of material fact in those reports, in statements in press releases issued

to the public and in statements by Geswein and Krakora during conference calls with stock

analysts.

51.     As a result of the foregoing, Geswein and Krakora knowingly or recklessly made

misrepresentations or omissions of material fact when they signed Diebold's Forms 10-K for the

years 2003 and 2004 (signed by Geswein and Krakora), the Forms 10-K for the years 2005 and

2006 (signed by Krakora), and each of Diebold's Form 10-Q reports covering the quarterly

periods within those years and the first quarter of 2007.  Geswein and Krakora also made materially false and misleading statements and omissions of material fact in statements in press releases issued to the public and in statements by Geswein and Krakora during conference calls with stock analysts with regard to those same periods of time.

52.     As Geswein and Krakora knew or were reckless in not knowing, those reports and statements contained false and misleading statements and omissions of material fact about Diebold's revenues and earnings, and failed to disclose the material facts surrounding Diebold's use of bill-and-hold accounting, including but not necessarily limited to the fact that Diebold was improperly using bill-and-hold accounting, that Diebold had prematurely recognized material amounts of revenue and was not complying with GAAP requirements, that Diebold changed its procedures and documentation for bill-and-hold transactions in 2004 and anticipated a significant drop in revenue as a result, and that in 2004 Diebold was staggering its implementation of its revised policies regarding revenue recognition in order to smooth earnings and hide the impact of its changed policies.

53.     As examples of the foregoing, Geswein and Krakora signed the following forms that were filed with the Commission.  These forms materially overstated Diebold's revenues and earnings for years including 2003 because they included material amounts of revenue and earnings from bill-and-hold transactions that did not meet the applicable criteria, and these forms touted the high level of revenues and earnings that Diebold supposedly had achieved for 2003:

(a)     The Form 10-K for 2003, which Geswein and Krakora signed on or about February 27, 2004;

(b)    The Form 10-K for 2004, which Geswein and Krakora signed on or about March 4, 2005,  which reported materially false revenue and earnings figures for 2003, and asserted that net sales were "8.7 percent higher than net sales for 2002."

(c)    A restatement (the "2005 Restatement"), which Geswein and Krakora signed on or about August 12, 2005.   The 2005 Restatement amended Diebold's financial statements for prior years including 2003.  The 2005 Restatement changed various figures related to revenue and earnings for 2003, specifically stating that the figures reported therein replaced the figures previously reported in Diebold's Form 10-K for 2003.  The 2005 Restatement touted the high level of earnings and revenues for 2003 compared to prior periods.  Yet, these earnings and revenue figures once again were materially misstated because they included material amounts of revenue and earnings from bill-and-hold transactions that did not meet the applicable criteria.  According to Diebold's 2008 restatement, Diebold's net income for 2003 had been overstated by $29.5 million attributable to improper bill-and-hold accounting.

(d)    The Form 10-K for 2005, which Krakora signed on or about March 13, 2006, which once again materially overstated Diebold's revenues and earnings for various years including 2003, because those figures included material amounts of revenue and earnings from bill-and-hold transactions that did not meet the applicable criteria.

54.    Miller, as Director of Corporate Accounting, was responsible along with Geswein and Krakora for ensuring that Diebold's revenue recognition policies, including its policies regarding bill-and-hold, complied with GAAP, and for overseeing Diebold's filings with the Commission.  Miller, acting knowingly or recklessly, through actions including but not necessarily limited to those described above, participated in and helped enable the practices by

16

which Diebold misused bill-and-hold accounting and by which Diebold made the resulting materially false and misleading statements and omissions of material fact in reports filed with the Commission as discussed herein.

**Recognition of Revenue on a Lease Agreement Subject to a Side Buy-back Agreement**

55.     Under GAAP, the full amount of revenue from a transaction cannot be recognized if the transaction is subject to significant future obligations or contingencies, such as a buy-back agreement.

56.     As detailed below, Geswein and Krakora participated in a scheme to prematurely recognize revenue from a transaction that was subject to a buy-back agreement.

57.     In the first quarter of 2005, Diebold entered into an agreement to lease a portfolio of ATMs located in WalMart stores to a private company, Cash Depot, for $5 million.  In this transaction, Diebold entered into a side agreement with Cash Depot, giving Cash Depot the right to "sell" the ATMs back to Diebold at a later date.

58.     Geswein agreed to the buy-back provision when he met with Cash Depot's CEO to negotiate the transaction in the first quarter of 2005.  Geswein told the Diebold sales representative working on the transaction to speak with Krakora about how to draft the agreement with Cash Depot with a buy-back provision, so that the company ostensibly could still recognize all the revenue from the transaction in the first quarter of 2005.

59.     In the first quarter of 2005, Krakora advised the Diebold sales representative that two agreements would be needed:  an agreement for the sale of the ATMs to Cash Depot and a separate side agreement regarding the buy-back provision.  After meeting with Krakora, the sales representative told Geswein that Krakora said that a separate side agreement regarding the buy-back provision was needed for revenue recognition in the first quarter of 2005.

60.    Because the Cash Depot transaction was subject to significant future obligations or contingencies (i.e., the buy-back agreement), it was improper under GAAP for Diebold to recognize the entire $5 million in revenue on this transaction in the first quarter of 2005.

61.    Geswein and Krakora failed to inform Diebold's auditors of the existence of the side agreement with Cash Depot.

62.    Notwithstanding the foregoing, Diebold improperly recognized all $5 million in revenue on this transaction in the first quarter of 2005.  Approximately $3.3 million of that amount represented earnings, which accounted for approximately 8% of Diebold's total pretax earnings that quarter.

63.    At all relevant times, Geswein and Krakora knew, or were reckless in not knowing, that Diebold was recognizing the $5 million in revenue from the Cash Depot transaction, that the sale was subject to a buy-back agreement, and that therefore the company's recognition of the full amount of revenue and earnings on the transaction was improper.

64.    As a result of the foregoing, Diebold's revenue and earnings figures for the first quarter of 2005 were materially false and misleading.  Geswein, knowingly or recklessly, gave such false and misleading figures to the public through various means, including but not necessarily limited to Diebold's Form 10-Q for the first quarter of 2005, which was signed by Geswein on or about May 5, 2005, as well as in a conference call with analysts on April 20, 2005.  Geswein knew or was reckless in not knowing that the Form 10-Q and his statements were materially false and misleading in that they included the $5 million in revenue and resulting earnings from the Cash Depot transaction, which could not all properly be included under GAAP, and he failed to disclose that the Cash Depot transaction was subject to the side agreement, as described above.

**Manipulating Reserves and Accruals**

65.     Under GAAP, an issuer is required to accrue for anticipated liabilities, and a liability should only be released in appropriate circumstances such as the occurrence of a specified event or when the estimate should be revised in response to new information. Moreover, maintaining general or excess reserves (i.e., cookie jar reserves) is prohibited under GAAP.

66.     From 2002 to 2006, as discussed below, Geswein, Krakora, and Miller routinely manipulated Diebold's reserves and accruals in order to manage earnings in violation of GAAP requirements, as detailed below.

*Under-accrued Liabilities*

67.     During the relevant time period, Geswein, Krakora and Miller inflated Diebold's earnings by failing to accrue for known liabilities, in violation of GAAP.  As detailed below, this caused Diebold's financial results to be materially inflated.

68.     For example, Geswein and Krakora knew, or were reckless in not knowing, the liability account for the company's Long Term Incentive Plan ("LTIP") – an employee benefit plan intended to reward long term company performance – was under-accrued for much of 2002 and 2003.  For example, in a May 9, 2003 email from Krakora to Geswein, Krakora explained that "GAAP requires variable accounting for the LTIP, so technically each quarter we should be adjusting the accrual to reflect expected shares to be earned on a pro-rata basis times the price of the stock at quarter-end."   In fact, as Krakora knew, Diebold was not making the required adjustments each quarter.  Moreover, at the time of this email, Krakora's calculations indicated that the LTIP accrual was under-accrued by at least $5 million.

69.     In order to accrue for the LTIP in 2003 without negatively impacting earnings, Diebold, through the actions of Defendants, offset the liability by improperly reducing other

accounts, including an unreconciled accounts payable account and an unreconciled deferred revenue account.

70.     For example, in May 2003, Miller, acting in concert with Geswein and Krakora, made a manual journal entry in which she funded the LTIP accrual by reducing an inventory account even though, contrary to the requirements of GAAP, she had no accounting basis to justify reducing the inventory account.

71.     Miller made another improper entry by reducing the deferred revenue account (internally named "Account 270") to fund the LTIP reserve.  One of Miller's staff members raised questions concerning the proposed entry.  Notwithstanding these questions, Miller made the inappropriate entry.

72.      Geswein, Krakora and Miller knew or were reckless in not knowing that making improper journal entries regarding such accrual accounts was in violation of GAAP and would cause the revenues and/or earnings that Diebold reported to the public to be overstated and false.

73.     In 2003 alone, Geswein, Krakora, and Miller's manipulation of various accrual accounts had the effect of improperly under-accruing Diebold's liabilities, and overstating Diebold's reported pre-tax earnings by at least $16 million.

74.     By reason of the foregoing, as a result of the actions of Geswein, Krakora and Miller, Diebold's statements of its earnings for 2003 were materially false and misleading.  Such statements were included in Diebold's Form 10-K for 2003, which Geswein and Krakora signed on or about February 27, 2004, and were included in the 2005 restatement of Diebold's income for 2003, which Geswein and Krakora signed on or about August 12, 2005, and in the Form 10-K for 2005, which Krakora signed on or about March 13, 2006.

75.     From at least 2002 through 2005, Geswein knew, or was reckless in not knowing, that Diebold, in violation of GAAP,  failed to properly accrue for other liabilities, including its North American sales commission accrual (commissions to be paid to sales personnel) and its team incentive accrual (incentive pay to be paid to service personnel).  In 2005, Diebold restated its financial statements to correct errors in certain accounts for the years 2002 to 2004 and the first quarter of 2005, including the North American sales commission accrual account (which in 2005 had been materially underaccrued by $11.4 million).

76.     Prior to the 2005 restatement, a Diebold vice president had informed Geswein that the commission accrual account was materially underaccrued.  Geswein took no action to correct the underaccrual.

77.     In 2005 and thereafter, as detailed below, Geswein and Krakora made statements to the public that were materially false and misleading in that they misrepresented and failed to disclose the truth about the commission accrual account and its impact on Diebold's finances. These false statements and omissions include but are not necessary limited to the following instances:

(a)     On June 30, 2005, Geswein signed a Form 8-K stating that "the company has identified a reconciliation issue in its North American sales commission accrual account."  Geswein further stated on a conference call with analysts that same day that "during management's review of the second quarter, we noted an error in the reconciliation process of the North American commission accrual."  He also said "it's something that, certainly, the process is in place and documentation is in place, but mechanically, the reconciliations weren't doing the job."  Geswein knew, or was reckless in not knowing, that his representations in the June 30, 2005 Form 8-K and conference

call were materially misleading because the sales commission accrual account was underaccrued due to his desire to meet forecasted targets, not due to an "error" or "reconciliations [that] weren't doing the job."

(b)     On August 15, 2005, Krakora signed Diebold's Form 10-Q for the second quarter of 2005, stating that the company needed to restate its financial statements due to a "reconciliation issue in its North America sales commission accrual account."  On November 4, 2005, Krakora signed Diebold's Form 10-Q for the third quarter of 2005, which repeated the misleading information that the need to restate Diebold's financial statements was due to a "reconciliation issue."  Krakora knew, or was reckless in not knowing, that his representations were materially false and misleading because the sales commission accrual account was underaccrued due to a desire to meet forecasted targets, not due to a "reconciliation issue."

*Cookie Jar Reserves*

78.     Geswein, Krakora, and Miller used "cookie jar" reserves to manage earnings, in violation of GAAP.  As described above, Diebold established a reserve of profit margin of $7.5 million in the last quarter of 2003.  Over the course of 2004, acting in concert with Geswein and Krakora, Miller released the reserve to fill shortfalls in operating results.  Geswein, Krakora and Miller knew or were reckless in not knowing that releasing the reserve in order to cover shortfalls in operating results, rather than based upon a legitimate accounting basis, was in violation of GAAP.

79.     Miller, acting in concert with Geswein and Krakora, released $1 million of the $7.5 million reserve in the first quarter 2004, $1.25 million in the second quarter of 2004, and the remaining $5.25 million in the third quarter of 2004.  As a result, Diebold exactly met analyst

earnings consensus for the first two quarters and the revised analyst earnings consensus in the third quarter.

80.      Geswein, Krakora, and Miller knew, or were reckless in not knowing, that these entries had no legitimate accounting basis, and they were recorded to fraudulently manage Diebold's reported earnings.

81.      Geswein, Krakora and Miller knew or were reckless in not knowing that making improper journal entries regarding such accrual accounts would cause the revenues and/or earnings that Diebold reported to the public to be overstated and false.

82.      In another example, in or about January 2004, Miller, acting in concert with Krakora and Geswein, established a $4.5 million corporate obsolescence and excess inventory account effective December 31, 2003.  This corporate inventory account was used as a cookie jar reserve that Geswein, Krakora, and Miller knew, or were reckless in not knowing, had no legitimate accounting basis and violated GAAP.

## Improperly Delaying and Capitalizing Expenses

### *Division 35 and CAP 250*

83.      As detailed below, Diebold failed to recognize certain expenses as incurred, and instead improperly deferred these expenses or spread the expenses over several reporting periods, which artificially increased net income in several fiscal years.  With regard to recording expenses, Geswein had a saying he used with subordinates: "take it by the drink." The expression meant that instead of recording the whole expense, Diebold would recognize its expenses a drink at a time.  Diebold engaged in improper expense deferrals in at least two accounts:  the "Division 35" and "CAP 250" accounts.

84.      Division 35 was a finished goods inventory account.  From 2003 through 2005, Geswein and Krakora knew, or were reckless in not knowing, that the value of the account was

overstated.  Various meetings had taken place in which Geswein and Krakora discussed that the Division 35 account had a large unexplained balance, and that the account needed to be reconciled.

85.     Nevertheless, Diebold improperly failed to reconcile the account until 2005. Then, in 2005, instead of restating its prior financial statements to correct the material errors in the account and record expenses in the proper reporting periods as required under GAAP, Diebold spread $15 million of expenses over two quarters in 2005.

86.      Geswein and Krakora knew, or were reckless in not knowing, that the overstatement of the Division 35 account inflated Diebold's earnings by $4.3 million in 2003, and more than $6.2 million in periods prior to 2003.

87.     CAP 250 was an installation accounting system, primarily consisting of two accounts accruing for the cost of installation.  Geswein and Krakora knew, or were reckless in not knowing, that the overstatement of this CAP 250 account inflated Diebold's earnings by $2.1 million in 2004, $2.2 million in 2003, and $4.4 million in periods prior to 2003.

*The Oracle Project*

88.     In 2002, Diebold began a project to replace many of its older internal software systems with Oracle software.  Under GAAP, capitalization of a software asset requires companies to properly capture internal and external costs involved with the various stages of software development.  Consequently, Diebold was permitted to capitalize certain costs associated with the Oracle project.  However, from 2003 through 2006, Diebold improperly capitalized costs that should have been expensed in the periods they were incurred.

89.      In certain quarters when Diebold's earnings were short of forecast, Miller, acting in concert with Geswein and Krakora, made top-level entries to fraudulently capitalize additional expenses to the Oracle project.  These improper "additions," which often were round numbers

such as $1 million, had the effect of materially reducing reported expenses, and thus increasing reported earnings.  Geswein, Krakora, and Miller knew, or were reckless in not knowing, that Diebold had been improperly capitalizing expenses related to the Oracle project since at least 2004.  For example, Miller made top-level entries to increase capitalization of Oracle expenses in the amounts of  $1 million effective September 30, 2004, amounts totaling $1 million effective in the fourth quarter of 2004, and $1.6 million effective March 31, 2005.

90.     Diebold's improper capitalization of expenses to the Oracle project increased Diebold's pre-tax earnings in 2003, 2004, and 2005, by at least $0.5 million, $3 million, and $6.8 million, respectively.

91.     Geswein, Krakora, and Miller knew, or were reckless in not knowing, that making such improper journal entries would cause the revenue and/or earnings figures reported by Diebold to the public to be overstated and false.

### Used Equipment Write-Ups

92.     Under GAAP, used equipment inventory should be valued at the lower of cost or market value.  From 2003 to 2005, Diebold often improperly "wrote-up" the value of certain used inventory, such as used ATMs.  These "write-ups" had the effect of reducing cost of goods sold and thus inflating earnings, and were used by Geswein and Krakora in order to meet earnings forecasts.

93.     For example, in the second quarter of 2004, Geswein and Krakora directed the write-up of value of used equipment inventory by $1 million (and thus increased net income by $1 million) to inflate earnings to meet forecasts.

94.     Miller improperly booked this $1 million entry without any legitimate accounting basis.

95.     Furthermore, Diebold improperly wrote up the value of other used equipment inventory (and inflated earnings) by $750,000 in the fourth quarter of 2004, $1.2 million in the first quarter of 2005, and $1 million in the second quarter of 2005.

96.     Geswein, Krakora, and Miller knew, or were reckless in not knowing, that these used equipment "write-ups," which were listed on several "opportunity lists," had no legitimate accounting basis, violated GAAP and were used improperly to inflate Diebold's earnings.

97.     Geswein, Krakora, and Miller knew, or were reckless in not knowing, that the making of such improper journal entries would cause the revenue and/or earnings figures reported by Diebold to the public to be overstated and false.

## Diebold's 2008 Restatement

98.     As result of Diebold management's improper, and in many instances fraudulent, accounting practices from at least 2002 to 2007, the financial statements that Diebold incorporated into its periodic filings and other materials disseminated to the investing public were materially false and misleading.  Diebold's improper accounting practices significantly inflated the company's reported earnings.  To correct the more recent misstatements, on September 30, 2008, Diebold restated its financial statements for the years 2003 through 2006, and the first quarter of 2007, in its Form 10-K for 2007.

## Impact of the Defendants' Fraudulent Schemes– Materially Misleading Financial Reports and Statements

99.     The improper accounting entries that resulted from all of Defendants' improper schemes as discussed above were material, individually or collectively.  This caused Diebold's statements of its revenues and/or earnings from at least 2003 through the first quarter of 2007 to present a materially false and misleading picture of Diebold's financial performance.  Such statements appeared in Diebold's Forms 8-K, 10-K, and 10-Q filed with the Commission and

available to the public, appeared in other presentations of Diebold's finances in press releases distributed to the public, and were stated in conference calls with stock analysts with respect to that time period.

100.     The false statements about Diebold's revenues and/or earnings, which resulted from the conduct of Geswein, Krakora and Miller, as described above, included but are not limited to the false reports and statements described above, and the following additional examples:

(a)     After Diebold announced its fourth quarter 2003 earnings results, on January 28, 2004, Geswein stated on a conference call with investment analysts, "let me echo Wally's sentiments of how pleased we are to report record revenue and profits with EPS of 81 cents per share, which is near the high end of our previous guidance of 78 cents to 83 cents per share." Diebold's Form 10-K for 2003 (signed by Geswein and Krakora on or about February 27, 2004), repeated the EPS figure of $0.81 for the fourth quarter of 2003.   However, Diebold's earnings would not have met the company's previous guidance without Miller's improper manual journal entries made in concert with Geswein and Krakora.  Miller made a $14.8 million entry to an unreconciled deferred revenue account and an $8.5 million entry to an unreconciled accounts payable account, increasing Diebold's pre-tax income by over $23 million.  Without these journal entries, Diebold's reported fourth quarter 2003 EPS would have been about 25% lower, which would have been well outside its previous guidance range.

(b)     After Diebold announced its fourth quarter 2004 earnings results, on January 26, 2005, Geswein stated on a conference call with investment analysts, "We are pleased to report record revenue, earnings, and free cash flow for the quarter.  Reported

revenue was $717 million, up 10.6 percent while reported EPS was 87 cents, an increase of 7.4 percent and within previous guidance of 87 to 92 cents a share."  However, Diebold's earnings would not have been within Diebold's previous guidance but for several of the Defendants' fraudulent schemes described above.  For example, Diebold's pre-tax income was increased by over $8 million by "pulling-in" $1.3 million of earnings from F-term transactions, switching orders from F-terms to I-terms resulting in an increase in $5.6 million of earnings, writing-up inventory by $750,000, and improperly capitalizing $1 million of expenses related to the Oracle project.   Without these entries, Diebold's fourth quarter 2004 EPS would have been over 10% lower, and would have been well outside its previous guidance range.

(c)  In Diebold's Form 10-Q for the first quarter of 2005 (signed by Geswein on or about May 5, 2005), the company reported EPS of $.37, which met its earnings forecast for that quarter of $.35 to $.40.  Diebold's reported EPS was inflated by improper transactions and accounting entries described above, including but not necessarily limited to the premature recognition of revenue from the Cash Depot transaction, improper capitalization of expenses on the Oracle project, and improper reversal of a portion of the "cookie jar" excess and obsolescence reserve.  Without this fraudulent accounting, Diebold's reported EPS would have been well below the quarterly earnings forecast.

**Geswein and Krakora Misled Auditors**

101.    Throughout their scheme, Geswein and Krakora misled Diebold's external auditors by making materially false and misleading statements and omissions in connection with the quarterly reviews and annual audits of the financial statements.  Geswein and Krakora

submitted management representation letters to the auditors with respect to the annual and quarterly reports and financial statements referred to herein, and those financial statements were made part of Forms 10-K and 10-Q that were filed with the Commission.

102.    With regard to Diebold's annual reports and financial statements for the years 2003 through 2006, the false management representation letters included but are not necessarily limited to letters that Geswein and Krakora signed and sent to the auditors on or about January 28, 2004 and February 28, 2005, and letters that Krakora signed and sent to the auditors on March 10, 2006, and March 1, 2007.

103.    With regard to Diebold's quarterly reports and financial statements within the years 2003 through 2006, the false management representation letters included but are not necessarily limited to letters that Geswein and Krakora signed and sent to the auditors on or about April 22, 2003, August 8, 2003, October 22, 2003, May 7, 2004, August 4, 2004, November 2, 2004, May 5, 2005, August 12, 2005, and letters that Krakora signed and sent to the auditors on or about November 4, 2005, May 9, 2006, August 7, 2006, and November 6, 2006.

104.    In the letters referred to above, Geswein and Krakora made false statements including but not necessarily limited to assertions that the subject quarterly and annual financial statements were presented in conformity with GAAP and that they (Geswein and Krakora) had no knowledge of any fraud that could have a material effect on the financial statements. Geswein and Krakora knew or were reckless in not knowing that such assertions were false and concealed the numerous fraudulent schemes and activities described herein.

## **Defendants' Actions Were a Continuing Course of Conduct**

105.    The actions and practices described above were part of a continuing course of conduct by the Defendants, designed to inflate Diebold's reported revenues and earnings.  The actions of the Defendants as described above were so closely related to each other as to be part of a continuing practice.

## **Defendants Fraudulently Concealed Their Actions**

106.    Defendants fraudulently concealed their wrongful conduct through a number of steps which helped prevent their conduct from being discovered by the Commission, including but not necessarily limited to these:

(a)    On February 18, 2005, Geswein wrote a letter to the Commission staff, in response to the staff's question about how Diebold recognized revenue.  Geswein misled the staff by stating, among other things, that Diebold recognizes revenue when "the products or services have been provided to the customer."  This was substantially false and misleading because, as Geswein knew or was reckless in not knowing, Diebold's bill-and-hold practices were contrary to that statement.  Geswein's statement concealed Diebold's improper use of bill-and-hold accounting.

(b)    As described above, between 2003 and 2007, Geswein and Krakora wrote multiple management representation letters to KPMG, Diebold's auditors, falsely stating that Diebold's quarterly and annual financial statements were presented in conformity with GAAP and that they had no knowledge of any fraud that could have a material effect on the financial statements.  In fact, as described above, Geswein and Krakora knew or were reckless in not knowing that Diebold's financial statements were not in conformity with GAAP, and Diebold personnel had engaged in fraudulent actions that materially

affected the financial statements.  Geswein's and Krakora' false letters concealed the wrongful conduct described herein.

(c)     Beginning in mid-2004, following the end of each fiscal quarter, Diebold officials including Geswein, Krakora and Miller each responded to a checklist that required them to disclose information about Diebold's accounting practices during that quarter.  Defendants' responses were used by Diebold officials in connection with certifying Diebold's financial reports, as required by Section 302 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7241], and the substance of such responses was provided to Diebold's auditors, KPMG.   In each such quarterly response, Defendants were required to disclose whether they were aware of, among other things, fraud, material transactions that had not been properly recorded, any instances in which accounting policies within their areas of responsibility and control properly failed to represent the true nature of the specific accounting transactions of which they were aware, and any instances in which revenues recorded in that quarter were not from inventory sold or other services provided before the last day of the quarter.  In their responses to those quarterly checklists for the second quarter of 2004 through at least the fourth quarter of 2006 (or, with regard to Geswein and Miller, until they were no longer employed at Diebold), Defendants failed to timely disclose the fraudulent activities that are described above and of which they were aware.  Defendants thus concealed such wrongdoing.

(d)     Following the end of each fiscal quarter in at least the years 2004 and 2005, Miller gave Diebold's auditors oral and/or written responses to questions including but not limited to questions that in substance asked about whether there had been significant accounting or financial changes or events, unusual journal entries, or fraud.  In

her responses, Miller failed to timely disclose the fraudulent activities described above and of which she was aware, thus concealing such wrongdoing.

(e)  On January 15, 2004, Miller wrote an email to another Diebold employee, enclosing a listing of journal entries that included the improper entry to fund the LTIP accrual in 2003, as described above.  Miller's email advised the other employee to "make sure this doesn't get passed around.  This is a pretty confidential one."

107.  The Commission was diligent in investigating the accounting at Diebold.  The Commission filed this case within five years of discovering the facts that form the basis for this cause of action.

### Tolling Agreements

108.  Each of the Defendants signed a tolling agreement that tolled and suspended the running of any statute of limitations for one year.  Geswein signed a tolling agreement on or about September 23, 2008, which tolled and suspended the running of the statute of limitations from August 25, 2008 through August 25, 2009.  Krakora signed a tolling agreement on or about August 29, 2008, which tolled and suspended the running of the statute of limitations from August 27, 2008 through August 27, 2009.  Miller signed a tolling agreement on or about August 17, 2008, which tolled and suspended the running of the statute of limitations from August 15, 2008 through September 15, 2009.

### Krakora and Geswein Received Bonuses and
### Other Incentive-Based and Equity-Based Compensation

109.  During the 12-month period following the issuance of Diebold's 2003 financial statements, Geswein received from the company incentive-based and equity-based compensation, including cash bonuses, shares of Diebold stock and stock options.

110.     During the 12-month period following the issuance of Diebold's 2005 financial statements, Krakora received incentive-based and equity-based compensation, including cash bonuses, shares of Diebold stock and stock options.

111.     During the 12-month period following the issuance of Diebold's 2006 financial statements, Krakora received incentive-based and/or equity-based compensation, including shares of Diebold stock and stock options.

## FIRST CLAIM FOR RELIEF

### Violations of Securities Act Section 17(a) [15 U.S.C. §77q(a)]

112.     Paragraphs 1 through 111 are realleged and incorporated by reference.

113.     By reason of the conduct described above, Defendants Geswein, Krakora, and Miller, in connection with the offer or sale of securities, by the use of any means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, directly or indirectly (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or course of business which operates or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

114.     By reason of the conduct described above, Defendants Geswein, Krakora, and Miller violated Securities Act Section 17(a) [15 U.S.C. §77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]

115.     Paragraphs 1 through 114 are realleged and incorporated by reference.

116.    By reason of the conduct described above, Defendants Geswein, Krakora, and Miller, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, directly or indirectly (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or course of business which operates or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

117.    By reason of the conduct described above, Defendants Geswein, Krakora, and Miller violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

**Violations of the Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and
Exchange Act Rule 13b2-1 [17 C.F.R. §§ 240.13b2-1]**

118.    Paragraphs 1 through 117 are realleged and incorporated by reference.

119.    By reason of the conduct described above, Defendants Geswein, Krakora, and Miller knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified books, records, or accounts subject to Exchange Act Section 13(b)(2).

120.    By reason of the conduct described above, Defendants Geswein, Krakora, and Miller directly or indirectly, falsified or caused to be falsified books, records or accounts subject to Exchange Act Section 13(b)(2).

121.    By reason of the conduct described above, Defendants Geswein, Krakora, and

Miller violated Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule

13b2-1 [17 C.F.R. §§ 240.13b2-1].

## FOURTH CLAIM FOR RELIEF

### Violations of Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2]
### (Defendants Geswein and Krakora only)

122.    Paragraphs 1 through 121 are realleged and incorporated by reference.

123.    By reason of the conduct described above, Defendants Geswein and Krakora

directly or indirectly, (i) made or caused to be made materially false or misleading statements or

(ii) omitted to state, or caused others to omit to state, material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading,

to an accountant in connection with an audit, review or examination of financial statements or

the preparation or filing of a document or report required to filed with the Commission.

124.    By reason of the conduct described above, Defendants Geswein and Krakora

violated Exchange Act Rule 13b2-2 [17 C.F.R. §§ 240.13b2-2].

## FIFTH CLAIM FOR RELIEF

### Violations of Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14]
### (Defendants Geswein and Krakora only)

125.    Paragraphs 1 through 124 are realleged and incorporated by reference.

126.    Defendant Geswein certified in Diebold's 2002, 2003, and 2004 Forms 10-K that,

among other things, he reviewed each of these reports, and based on his knowledge, these

reports:  (i) did not contain any untrue statement of material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances under which they were

made, not misleading and (ii) included financial statements and other information which fairly

present, in all material respects, Diebold's financial condition, results of operations and cash flows.

127.    Defendant Krakora certified in Diebold's 2005 and 2006 Forms 10-K that, among other things, he reviewed each of these reports, and based on his knowledge, these reports:  (i) did contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading and (ii) included financial statements and other information which fairly present, in all material respects, Diebold's financial condition, results of operations and cash flows.

128.    By reason of the conduct described above, Defendants Geswein and Krakora violated Exchange Act Rule 13a-14 [17 C.F.R. §§ 240.13a-14].

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Diebold's Violations of Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13]

129.    Paragraphs 1 through 128 are realleged and incorporated by reference.

130.    Diebold, whose securities were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], failed to file annual, current, and quarterly reports (on Forms 10-K, 8-K, and 10-Q) with the Commission that were true and correct, and failed to include material information in its required statements and reports as was necessary to make the required statements, in the light of the circumstances under which they were made, not misleading.

131.    Diebold violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, and l3a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

132.     By reason of the conduct described above, Defendants Geswein, Krakora, and

Miller knowingly provided substantial assistance to and thereby aided and abetted Diebold in its

violations of Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11,

and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

## SEVENTH CLAIM FOR RELIEF

### Aiding and Abetting Diebold's Violations of Exchange Act
### Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]

133.     Paragraphs 1 through 132 are realleged and incorporated by reference.

134.     Diebold, whose securities were registered pursuant to Section 12 of the Exchange

Act [15 U.S.C. § 78l]:

        (a)     failed to make and keep books, records, and accounts, which, in

reasonable detail, accurately and fairly reflected the transactions and dispositions of its

assets; or

        (b)     failed to devised and maintain a system of internal controls sufficient to

provide reasonable assurances that (i) transactions were recorded as necessary to permit

preparation of financial statements in conformity with generally accepted accounting

principles or any other criteria applicable to such statements, and (ii) to maintain

accountability of assets.

135.     Diebold violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15

U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

136.     By reason of the conduct described above, Defendants Geswein, Krakora, and

Miller knowingly provided substantial assistance to and thereby aided and abetted Diebold in its

violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A)

and 78m(b)(2)(B)].

## EIGHTH CLAIM FOR RELIEF

**Failure to Reimburse –
Violations of Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243]
(Defendants Geswein and Krakora only)**

137.    Paragraphs 1 through 136 are realleged and incorporated by reference.

### Geswein's Failure to Make the Required Reimbursement

138.    Diebold was required to prepare an accounting restatement of its 2003 and 2004 financial statements due to the material noncompliance of Diebold, as a result of misconduct, with financial reporting requirements under the securities laws, as described above.

139.    Geswein, as Diebold's Chief Financial Officer in 2003 and 2004, among other times, received cash bonuses or other incentive-based or equity-based compensation during the 12-month periods following the first public issuance or filing with the Commission of Diebold's 2003 and 2004 financial statements embodying such financial reporting requirements.

140.    Geswein has failed to reimburse Diebold for such cash bonuses, or other incentive-based or equity-based compensation.

141.    Accordingly, Geswein has violated Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243].

### Krakora's Failure to Make the Required Reimbursement

142.    Diebold was required to prepare an accounting restatement of its 2005 and 2006 financial statements due to the material noncompliance of Diebold, as a result of misconduct, with financial reporting requirements under the securities laws, as described above.

143.    Krakora, as Diebold's Chief Financial Officer in 2005 and 2006, among other times, received cash bonuses or other incentive-based or equity-based compensation during the 12-month periods following the first public issuance or filing with the Commission of Diebold's 2005 and 2006 financial statements embodying such financial reporting requirements.

144.    Krakora has failed to reimburse Diebold for such cash bonuses, or other incentive-based or equity-based compensation.

145.    Accordingly, Krakora has violated Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

(a)    Permanently enjoining each defendant from violating, directly or indirectly, Securities Act Section 17(a), Exchange Act Sections 10(b) and 13(b)(5) and Exchange Act Rules 10b-5 and 13b2-1 and from aiding and abetting violations of Exchange Act Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13;

(b)    Permanently enjoining Geswein and Krakora from violating, directly or indirectly, Exchange Act Rules 13a-14 and 13b2-2;

(c)    Ordering each defendant to disgorge ill-gotten gains, with prejudgment interest, including, but not limited to, salaries, bonuses, and other benefits wrongfully obtained as a result of their fraudulent conduct;

(d)    Imposing civil monetary penalties against each defendant pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

(e)    Pursuant to Securities Act 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)], prohibiting Geswein and Krakora from acting as an officer or director of any issuer that has a class of securities registered pursuant to Exchange Act Section

12 [15 U.S.C. § 78l], or that is required to file reports pursuant to Exchange Act Section 15(d)

[15 U.S.C. § 78o(d)];

(f)     Ordering Geswein and Krakora to reimburse Diebold for bonuses and other

incentive-based and equity-based compensation that each received from Diebold, pursuant to

Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243]; and

(g)     Granting such other and further relief as the Court deems just and appropriate.

Dated:  June 29, 2010                              Respectfully submitted,


                                                        /s/ David J. Gottesman
                                                   David J. Gottesman
Of Counsel:                                        Assistant Chief Litigation Counsel
                                                   Tel.: (202) 551-4470
Scott W. Friestad                                  Fax: (202) 772-9245
Robert B. Kaplan                                   Email:  gottesmand@sec.gov
Brian O. Quinn
U.S. Securities and                                Robyn R. Bender
Exchange Commission                                Senior Counsel
                                                   Tel.:  (202) 551-4535
                                                   Fax:  (202) 772-9346
                                                   Email:  benderr@sec.gov

                                                   United States Securities and Exchange
                                                   Commission
                                                   100 F Street NE
                                                   Washington, DC 20549-4030

                                                   Attorneys for Plaintiff

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing ***First Amended Complaint*** was filed

electronically on June 29, 2010.  Notice of this filing will be sent to all parties who have

appeared, by operation of the Court's electronic filing system.  Parties may access this filing

through the Court's system.  Copies were also served by UPS, for next business-day delivery,

upon:

> Mr. Stephen S. Scholes
> McDermott Will & Emery
> 227 West Monroe St.
> Chicago, IL 60606
> Tel: 312-984-7762
> *Counsel for Gregory Geswein*
>
> John J. Carney
> Baker Hostetler LLP
> 45 Rockefeller Plaza
> New York, New York  10111
> Tel. 212/589-4255
> *Counsel for Kevin Krakora*
>
> Jonathan R. Barr
> Baker Hostetler LLP
> Washington Square, Suite 100
> 1050 Connecticut Avenue, NW
> Washington, DC  20036
> Tel. 202/861-1534
> *Counsel for Kevin Krakora*
>
> Virginia A. Davidson
> Calfee, Halter & Griswold LLP
> 1400 Keybank Center
> 800 Superior Avenue
> Cleveland, Ohio  44114-2688
> tel. 216/622-8588
> *Counsel for Sandra Miller*

_____/s/ David J. Gottesman_____
David J. Gottesman
